UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                :

COACH, INC. and COACH SERVICES, INC.,   :
                                :

                    Plaintiffs,   ::

                                :

           -against-              :

SHARON O'BRIEN, et al.,                 :

                                :

                   Defendants.  :
------------------------------------------------------ :
                                X

                                             USDC SDNY
                                             DOCUMENT
                                             ELECTRONICALLY FILED
                                             DOC #:_____
                                             DATE FILED: 4/13/12

                                             10 Civ. 6071 (JPO) (JLC)

                                               <u>ORDER</u>

J. PAUL OETKEN, District Judge:

       Plaintiffs Coach, Inc. and Coach Services, Inc. (collectively, "Coach"), bring this action

asserting various federal trademark claims against *pro se* defendant Sharon O'Brien, individually

and doing business as www.covermycellphone.com ("O'Brien"), who allegedly offered for sale

and sold cellular phone covers bearing counterfeits and infringements of Coach's federally

registered  trademarks.

       O'Brien answered the Complaint after the deadline provided by the Federal Rules of

Civil Procedure (the "Federal Rules").  Accordingly, Coach moved to strike O'Brien's Answer

and moved for a default judgment.  The motion was referred to Magistrate Judge James L. Cott

for a Report and Recommendation, and the case was referred to Judge Cott for general pretrial

purposes.  Although Coach's motion for a default judgment was denied (Dkt. Nos. 29, 30),

O'Brien subsequently failed to comply with several Court orders relating to discovery and her

defense of this litigation, and failed to respond to the Court's repeated attempts to contact her.

Finally, O'Brien failed to respond to the Court's Order to Show Cause why a default judgment

should not be entered against her under Federal Rules 37 and 55.  (Dkt. No. 34.)

On November 28, 2011, Judge Cott issued a thorough Report and Recommendation (the "Report") that the Court enter a default judgment against O'Brien, and award Coach, pursuant to Rule 55(b) of the Federal Rules, $12,875.95 in statutory damages for trademark infringement and costs, and enter a permanent injunction against O'Brien, as set forth in the Report. (Dkt. No. 39.)

On December 12, 2011, Coach filed an objection to the Report's calculation of statutory damages. (Dkt. No. 40.)  Coach does not object to any other aspect of the Report. O'Brien did not file an objection to the Report.

For the reasons that follow, the Court adopts the Report's findings and conclusions in full, except for the Report's calculation of damages.  The Court instead awards Coach $249,456.95 in statutory damages and costs.

## I.     Standard of Review

When reviewing a report and recommendation by a magistrate judge, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).  The Court reviews the Report strictly for clear error where no objection has been made, and will make a *de novo* determination regarding those parts of the Report to which objections have been made. *McDonaugh v. Astrue*, 672 F. Supp. 2d 542, 547 (S.D.N.Y. 2009) (citation omitted).

> However, objections that are merely perfunctory responses argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original petition will not suffice to invoke *de novo* review of the magistrate's recommendations.  Further, the objections must be specific and clearly aimed at particular findings in the magistrate judge's proposal.

*Id.* (internal citations and quotation marks omitted).  When a party makes only conclusory or general objections, or simply reiterates the original arguments, the Court will review the Report

strictly for clear error. *Crowell v. Astrue*, No. 08 Civ. 8019, 2011 WL 4863537, at *2 (S.D.N.Y. Oct. 12, 2011) (citing *Pearson–Fraser v. Bell Atl.*, No. 01 Civ. 2343, 2003 WL 43367, at *1 (S.D.N.Y. Jan. 6, 2003)).

## II.    Discussion

The Report, which the Court attaches to this Order, contains a thorough discussion of the factual and procedural background of the case.  The Court will not rehash this discussion here, and instead refers the parties to the Report.

Coach objects only to Judge Cott's calculation of damages, and, in fact, requests adoption of the rest of the Report.  Because the Court finds no clear error on the face of the record as to the rest of the Report, the Court adopts all of the findings of the Report except the damages calculation.

Coach objects that the Report's calculation of statutory damages is excessively low.  The Lanham Act provides for statutory damages of between $1,000 and $200,000 "per mark per type of goods or services sold, offered for sale, or distributed, as the court considers just."  15 U.S.C. § 1117(c).  For willful infringements, the court may award statutory damages up to $2,000,000 per mark per type of goods or services, also "as the court considers just."  *Id.*  Coach argued that O'Brien's infringements were willful and requested $1,000,000 for each of the three infringed marks, for a total of $3,000,000.  Judge Cott found that O'Brien's infringements were indeed willful, but awarded damages in the amount of $4,150 for each infringed mark, for a total of $12,450—well below the maximum award allowed under the statute.

As Judge Cott explained, courts have found that the Lanham Act "does not provide guidelines for courts to use in determining an appropriate award, as it is only limited by what the court considers just." *Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 315 F. Supp. 2d 511, 520

3

(S.D.N.Y. 2004) (internal citation omitted).  Courts typically look to the considerations set forth by decisions applying the statutory damages provision of the Copyright Act, 17 U.S.C. § 504(c). *See id.*  As set forth by the Second Circuit, in calculating statutory damages for copyright infringement, courts consider: (1) "the expenses saved and the profits reaped" by the defendant infringer; (2) "the revenues lost by the plaintiff"; (3) "the value of the copyright"; (4) "the deterrent effect on others besides the defendant"; (5) "whether the defendant's conduct was innocent or willful"; (6) "whether a defendant has cooperated in providing particular records from which to assess the value of the infringing material produced"; and (7) "the potential for discouraging the defendant." *Gucci*, 315 F. Supp. 2d at 520 (quoting *Fitzgerald Pub. Co., Inc. v. Baylor Pub. Co.*, 807 F.2d 1110, 1117 (2d Cir. 1986)).

Although statutory damages need not match actual damages, courts generally hold that "statutory damages should bear some relation to actual damages suffered." *Yurman Studio, Inc. v. Castaneda*, Nos. 07 Civ. 1241, 07 Civ. 7862, 2008 WL 4949775, at *2 (S.D.N.Y. Nov. 19, 2008) (quoting *RSO Records v. Peri*, 596 F. Supp. 849, 862 (S.D.N.Y. 1984)); *see also New Line Cinema Corp. v. Russ Berrie & Co.*, 161 F. Supp. 2d 293, 303 (S.D.N.Y. 2001) ("[S]tatutory damages should be commensurate with the actual damages incurred and, thus, the proper departure point is [defendant's] stipulated gross revenue."); *Sara Lee Corp. v. Bags of New York*, 36 F. Supp. 2d 161, 167 (S.D.N.Y. 1999) (noting that in calculating statutory damages, "actual damages, such as profits and losses, are a typical starting point for analysis").

In applying the *Fitzgerald* factors, Judge Cott found that although there was no evidence of lost revenues to Coach, the marks were valuable, the infringement was willful, and a significant award was necessary to deter the defendant and others from infringing the marks.

4

Thus, a monetary award was appropriate under the third, fourth, fifth and seventh *Fitzgerald* factors. The Court agrees with this conclusion.

In attempting to evaluate the "expenses saved and profits reaped" by O'Brien, *Fitzgerald*, 807 F.2d at 1117, Judge Cott looked to O'Brien's submissions in opposition to the motion for default judgment. There, O'Brien stated that her total revenues resulting from sales of the alleged infringing items, as reflected in the documents that she had voluntarily produced to Coach, was $5,533.76. (Dkt. No. 16 at 3.) Although there was no evidence regarding what O'Brien's costs were, Judge Cott assumed a 300% markup on each item, which other courts have used in assessing damages from the infringement of luxury goods. *See* Report at 21 (citing *Coach, Inc. v. Melendez*, No. 10 Civ. 6178, 2011 WL 4542971, at *7 (S.D.N.Y. Sept. 2, 2011); *Malletier v. Apex Creative Int'l Corp.*, 687 F. Supp. 2d 347, 358 (S.D.N.Y. 2010)).) This meant that O'Brien's profits from the approximately $5,534 in revenue were $4,150. Applying that total to each of the three infringed marks, Judge Cott arrived at the total statutory award of $12,450.

Coach argues that it is inappropriate to rely on the $5,534 figure because it is based upon O'Brien's own unsworn, unsubstantiated statements and incomplete discovery productions. Because, as detailed in the Report, O'Brien did not respond to formal discovery requests, Coach was without any means to verify the sales and profits derived from her infringing activities. The Court agrees that relying entirely upon the $5,534 figure is inappropriate—particularly given that one of the *Fitzgerald* factors is "whether a defendant has cooperated in providing particular records from which to assess the value of the infringing material produced." 807 F.2d at 1117.

At the same time, Coach's request for an arbitrary award of $1,000,000 per mark is no more sensible. Although statutory damages need not equal a hypothetical measure of actual

damages, as one treatise put it, statutory damages should at least be "woven out of the same bolt of cloth as actual damages." 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 14.04[E][1] (2011). There is nothing in this record to suggest that the actual damages from O'Brien's infringement even remotely approach $3,000,000.

The Defendant has made it impossible accurately assess the profits from the infringement. A willful infringer should not be able to unilaterally limit a damages award by providing unsubstantiated statements of the fruits of her infringement, and then disappear without providing any opportunity to assess the veracity of those statements. At the same time, a plaintiff should not reap a windfall multi-million dollar award from the actions of a single small-scale infringer.

In light of the willful nature of the infringement, O'Brien's failure to cooperate in "providing records to assess the value of the infringing material produced," and the policy of deterrence of willful infringement that is built into the statutory damages scheme, the Court will presume that O'Brien understated her own revenues from her infringing activity by a factor of 20. In other words, the Court will assume that the revenues she derived from selling infringing products was $110,675.20. (To be sure, this is a far larger amount than is realistic.) Assuming the same 300% markup that Judge Cott used, this amounts to total profits of approximately $83,000. Thus, for the three infringed marks, Coach is entitled to a statutory damages award of $249,000.

Although this award is far below what Coach has requested—and is below the maximum allowable under the statute—it is commensurate with the damages awards granted in similar cases, and is an award that the Court "considers just." 15 U.S.C. § 1117(c) *See All-Star Marketing Group, LLC v. Media Brands Co., Ltd.*, 775 F. Supp. 2d 613, 624-25 (S.D.N.Y. 2011)

(collecting cases "where the defendant willfully infringes on the plaintiff's mark and fails to stop

such behavior after being put on notice by the plaintiff or the court, but where there is no

concrete information about the defendant's actual sales figures and profits and the estimate of

plaintiff's lost revenue" with damages awards of between $25,000 and $250,000 per infringed

mark).

## III.  Conclusion

The Court adopts the Report's calculation of $456.95 for costs, but modifies the Report to

grant an award of statutory damages and costs to Coach in the amount of $249,000.  The total

award is thus $249,456.95.  The Court adopts the Report in all other respects.

The Court enters a default judgment against O'Brien as to liability pursuant to Rules

37(b)(2)(A(vi) and 55(a) of the Federal Rules, and enters the permanent injunction as set forth in

the Report and reprinted below:

Defendant Sharon O'Brien and her employees, agents, servants, successors, and assigns,

and all those acting in concert or participating therewith are hereby permanently enjoined from:

> (a) using any reproduction, counterfeit, copy, or colorable imitation of the Coach Registered Trademarks to identify any goods or the rendering of any services not authorized by Coach;

> (b) engaging in any course of conduct likely to cause confusion, deception or mistake, or injure Coach's business reputation or weaken the distinctive quality of the Coach Registered Trademarks, Coach's name, reputation or goodwill;

> (c) using a false description or representation including words or other symbols tending to falsely describe or represent O'Brien's unauthorized goods as being those of Coach or sponsored by or associated with Coach and from offering such goods in commerce;

> (d) further infringing or diluting the Coach Registered Trademarks by manufacturing, producing, distributing, circulating, selling, marketing, offering for sale, advertising, promoting, displaying or otherwise disposing of any products not authorized by Coach bearing any simulation, reproduction, counterfeit, copy or colorable imitation of the Coach Registered Trademarks;

(e) using any simulation, reproduction, counterfeit, copy or colorable imitation of the Coach Registered Trademarks in connection with the promotion, advertisement, display, sale, offering for sale, manufacture, production, circulation or distribution of any unauthorized products in such fashion as to relate or connect, or tend to relate or connect, such products in any way to Coach, or to any goods sold, manufactured, sponsored or approved by, or connected with Coach;

(f) making any statement or representation whatsoever, or using any false designation of origin or false description, or performing any act, which can or is likely to lead the trade or public, or individual members thereof, to believe that any services provided, products manufactured, distributed, sold or offered for sale, or rented by O'Brien are in any way associated or connected with Coach, or is provided, sold, manufactured, licensed, sponsored, approved or authorized by Coach;

(g) engaging in any conduct constituting an infringement of any of the Coach Registered Trademarks, of Coach's rights in, or to use or to exploit, said trademark, or constituting any weakening of Coach's name, reputation and goodwill;

(h) using or continuing to use the Coach Registered Trademarks or trade names in any variation thereof on the Internet (either in the text of a website, as a domain name, or as a keyword, search word, metatag, or any part of the description of the site in any submission for registration of any Internet site with a search engine or index) in connection with any goods or services not directly authorized by Coach;

(i) hosting or acting as Internet Service Provider for, or operating or engaging in the business of selling any web site or other enterprise that offers for sale any products bearing the Coach Registered Trademarks;

(j) acquiring, registering, maintaining or controlling any domain names that include the COACH trademark or any of the other Coach Registered Trademarks or any marks confusingly similar thereto, activating any website under said domain names, or selling, transferring, conveying, or assigning any such domain names to any entity other than Coach;

(k) using any e-mail addresses to offer for sale any nongenuine products bearing counterfeits of the Coach Registered Trademarks;

(l) having any connection whatsoever with any websites that offer for sale any merchandise bearing counterfeits of the Coach Registered Trademarks;

(m) secreting, destroying, altering, removing, or otherwise dealing with the unauthorized products or any books or records which contain any information relating to the importing, manufacturing, producing, distributing, circulating, selling, marketing, offering for sale, advertising, promoting, or displaying of all unauthorized products which infringe the Coach Registered Trademarks; and

8

(n) effecting assignments or transfers, forming new entities or associations or utilizing any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth in subparagraphs (a) through (m).

The Clerk of Court is directed to enter judgment accordingly.

SO ORDERED.

Dated: New York, New York
      April 13, 2012

                                    J. PAUL OETKEN
                         United States District Judge

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _11/28/11_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
COACH, INC. and COACH SERVICES, INC.,      :
                                            :
                            Plaintiffs,     :
                                            :
            -v.-                            :
                                            :
SHARON O'BRIEN, et al.,                     :
                                            :
                            Defendants.     :
------------------------------------------------------------X

10 Civ. 6071 (JPO) (JLC)

REPORT AND
RECOMMENDATION

**Exhibit**

JAMES L. COTT, United States Magistrate Judge.

To the Honorable J. Paul Oetken, United States District Judge:

Plaintiffs Coach, Inc. and Coach Services, Inc. (together, "Coach"), a well-known luxury brand, bring this action asserting various federal trademark claims against pro se defendant Sharon O'Brien, individually and doing business as www.covermycellphone.com ("O'Brien"), who allegedly offered for sale and sold cellular phone covers bearing counterfeits and infringements of Coach's federally registered trademarks. O'Brien has failed to comply with several Court orders relating to both discovery and her defense of this litigation, and has failed to respond to the Court's repeated attempts to contact her. In light of this conduct, which is detailed below, I recommend that the Court find O'Brien in default under Rule 37(b)(2)(A)(vi) of the Federal Rules of Civil Procedure. I further recommend that the Court direct the Clerk of the Court to enter a default judgment pursuant to Rule 55(a), and award Coach, pursuant to Rule 55(b), $12,875.94 in statutory damages for trademark infringement and for costs, and enter a permanent injunction against O'Brien.[1]

---

[1]      In conducting the inquiry relevant to this Report and Recommendation, I have relied on Coach's Motion to Strike Defendant's Answer and for a Default Judgment, dated January 14, 2011 (Dkt. No. 13) ("Motion for Default Judgment"), which the Court previously denied. (Dkt.

USDC SDNY
DATE SCANNED___11/28/11___

1

# I.   BACKGROUND

### A. Basis of the Lawsuit

Coach brings this action against O'Brien, an Illinois resident, asserting claims for

trademark counterfeiting; trademark infringement; trademark dilution; and unfair competition,

false designation of origin, and false description under 15 U.S.C. §§ 1114, 1125(a), (c).

(Complaint, dated Aug. 12, 2010 ("Complaint" or "Compl.") (Dkt. No. 1)).  Coach alleges that

O'Brien willfully infringed its marks by "selling, offering for sale, distributing, promoting and

advertising in interstate commerce" on her website, www.covermycellphone.com, cellular phone

covers bearing counterfeit and infringing marks similar to certain protected trademarks owned by

Coach.  (Compl. ¶¶ 10, 25-38).  Coach seeks, among other things, injunctive relief and damages

for willful infringement under 15 U.S.C. § 1117.  (Compl. ¶¶ I-XI).

### B. Procedural History

O'Brien was served with the Summons and Complaint on August 17, 2010 (Affidavit of

Service, dated Aug. 23, 2010 (Dkt. No. 4)) such that her answer or other response was due on

September 7, 2010.  Fed. R. Civ. P. 12(a), (b).  On September 10, 2010, Coach obtained entry of

default against O'Brien (Clerk's Certificate of Default, dated Sept. 10, 2010 (Dkt. No. 13-2)),

who was then proceeding pro se.  (Defendant's Reply Memorandum in Opposition to Plaintiff's

Motion to Strike Defendant's Answer, and Plaintiff's Motion for Default Judgment, dated Jan.

---

No. 30).  Coach renewed its application for a default judgment in a November 15, 2011 letter to
the Court ("November 15 Letter").  (Dkt. No. 37).  Moreover, although entry of default under
Rule 55 necessitates a subsequent inquest to determine the amount of damages, because Coach
previously submitted all relevant information in support of its Motion for Default Judgment, and
O'Brien submitted her Opposition to the Motion for Default Judgment, there is no need for
separate inquest proceedings.  See, e.g., Action S.A. v. Marc Rich & Co., 951 F.2d 504, 508 (2d
Cir. 1991) (sufficient basis to evaluate compensatory damages where court was "inundated with
affidavits, evidence, and oral presentations by opposing counsel").  Should Coach object to my
reliance on the Motion for Default Judgment in considering the renewed application, it should so
advise Judge Oetken in any objections to this Report and Recommendation.

28, 2011 ("Opposition to the Motion for Default Judgment" or "Def.'s Mem.") (Dkt. No. 16), at

2). On November 10, 2010, after obtaining counsel and engaging unsuccessfully in settlement

discussions with Coach, O'Brien filed an Answer to the Complaint. (Notice of Appearance,

dated Sept. 14, 2010 (Dkt. No. 5); Defendant's Answer, dated Nov. 10, 2010 (Dkt. No. 7)). On

January 14, 2011, Coach moved to strike the answer and enter a default judgment against

O'Brien. (Dkt. No. 13). Shortly after O'Brien filed her opposition to the motion on January 28,

2011, the Court granted the motion of O'Brien's counsel to withdraw from the case. (Order,

dated Jan. 31, 2011 (Dkt. No. 17)).[2]

On May 17, 2011, the Honorable George B. Daniels, to whom the case was originally

assigned,[3] referred Coach's Motion for Default Judgment to me, and for a potential inquest (Dkt.

No. 24), and on June 21, 2011, he also referred the case to me for general pretrial purposes,

including settlement. (Dkt. No. 26). I conducted telephone conferences with the parties

regarding the possibility of settlement on June 30, July 7, and July 14, 2011. When the parties

were unable to reach a settlement and upon Coach's request, I reinstated Coach's Motion for

Default Judgment (Endorsed Letter to the Court from Walter-Michael Lee, dated July 18, 2011

(Dkt. No. 28)), which I had deemed withdrawn during the pendency of the settlement

discussions. (Order, dated July 7, 2011 (Dkt. No. 27)). In a Report and Recommendation dated

July 27, 2011, I recommended that Judge Daniels deny the Motion for Default Judgment. (Dkt.

No. 29). Judge Daniels adopted the Report and Recommendation by Memorandum Decision and

Order dated September 1, 2011. (Dkt. No. 30).

---

[2]     Accordingly, O'Brien is again proceeding pro se. (Notice of Appearance, dated May 10,
2011 (Dkt. No. 25)).

[3]     On October 6, 2011, this case was reassigned to Judge Oetken. (Dkt. No. 33).

3

By Order dated September 9, 2011, I directed the parties to complete discovery by

October 4, 2011, and to serve and file all dispositive motions by December 3, 2011. (Dkt. No.

31). Shortly thereafter, Coach advised the Court that O'Brien had failed to respond to Coach's

First Set of Interrogatories and Request for the Production of Documents, served July 28, 2011

(the "Discovery Requests"). (Letter to the Court from Walter-Michael Lee, dated Sept. 13, 2011,

at 1 (Dkt. No. 35)). Consequently, by Order dated September 16, 2011, I directed O'Brien to

respond to the Discovery Requests no later than September 28, 2011. (Dkt. No. 32). O'Brien

did not respond to the Discovery Requests, nor did she appear for a noticed deposition on

September 30, 2011. (November 15 Letter at 1-2).

Having been advised of O'Brien's failure to comply with the September 16 Order (Letter

to the Court from Walter-Michael Lee, dated Sept. 30, 2011, at 2 (Dkt. No. 36)), I instructed

counsel for Coach to confer with O'Brien as to the parties' availability for a discovery

conference. O'Brien did not respond to counsel for Coach; as a result, on October 4 and 5, 2011,

my chambers attempted to contact her both by e-mail and phone. O'Brien did not respond to the

Court's messages either. Accordingly, on October 6, 2011, I ordered O'Brien to show cause

why the Court should not find her in default pursuant to Rule 37(b)(2)(A)(vi) and recommend

the entry of a default judgment pursuant to Rule 55. (Dkt. No. 34). My chambers mailed the

October 6 Order to Show Cause—as well as the discovery orders dated September 9 and

September 16—to the Alsip, Illinois address O'Brien listed as her contact information on the

notice that she would proceed pro se after withdrawal of her counsel. (Dkt. No. 25). To date,

O'Brien has not responded to the October 6 Order to Show Cause although the deadline for a

response was October 21, 2011, nor has she sought an extension of her time to do so. Thus,

4

neither counsel for Coach nor the Court has had any contact with O'Brien since the last settlement conference, held on July 14, 2011. (November 15 Letter at 2).

## II. DISCUSSION

### A. Default Judgment as a Sanction Under Rule 37

Rule 37(b)(2)(A) authorizes a court to impose a range of sanctions in the event that a party fails to comply with a court order, including the "rendering [of] a default judgment against the disobedient party[.]" Fed. R. Civ. P. 37(b)(2)(A)(vi). Although Rule 37 sanctions are "a harsh remedy to be used only in extreme situations," Agiwal v. Mid Island Mortgage Corp., 555 F.3d 298, 302 (2d Cir. 2009) (citation omitted), they "protect other parties to the litigation from prejudice resulting from a party's noncompliance with discovery obligations" and "serve other functions unrelated to the prejudice suffered by individual litigants[,]" including specific and general deterrence. S. New England Tel. Co. v. Global NAPs Inc., 624 F.3d 123, 149 (2d Cir. 2010) (internal quotation marks and citations omitted).

The Second Circuit has articulated "[s]everal factors [that] may be useful in evaluating a district court's exercise of discretion" to impose sanctions pursuant to Rule 37, including "(1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance, and (4) whether the non-compliant party had been warned of the consequences of noncompliance." Agiwal, 555 F.3d at 302-03 (quoting Nieves v. City of New York, 208 F.R.D. 531, 535 (S.D.N.Y. 2002)) (internal quotation marks and alteration omitted). These factors are not exclusive and none is dispositive, "[b]ecause the text of the rule requires only that the district court's orders be 'just,'" and "because the district court has 'wide discretion in imposing sanctions under Rule 37[.]'" S. New England Tel. Co., 624 F.3d at 144 (quoting Shcherbakovskiy v. Da Capo Al Fine, Ltd., 490 F.3d

5

130, 135 (2d Cir. 2007) (internal quotation marks omitted)). Each of these factors favors

"rendering a default judgment" against O'Brien. Fed. R. Civ. P. 37(b)(2)(vi).

O'Brien's current status as a pro se litigant does not change this inquiry or my

recommendation. "[A]ll litigants, including pro ses, have an obligation to comply with court

orders." McDonald v. Head Criminal Court Supervisor Officer, 850 F.2d 121, 124 (2d Cir.

1988). "[F]ailure to comply may result in sanctions," including Rule 37 sanctions. Agiwal, 555

F.3d at 302; see also McDonald, 850 F.2d at 124 ("When [pro se litigants] flout that obligation

they, like all litigants, must suffer the consequences of their actions.").

### 1. Willfulness

There can be no dispute that O'Brien has failed to comply with her discovery obligations

and that her failures were willful under the law. After successfully opposing Coach's Motion for

Default Judgment, which afforded her an opportunity to resolve this dispute on the merits,

O'Brien then failed to comply with the Court's subsequent discovery order requiring a response

to the Discovery Requests by September 28, 2011. She further failed to respond to the attempts

of both counsel for Coach and the Court to contact her to schedule a discovery conference in

early October. O'Brien's noncompliance continued with her failure to respond to the October 6

Order to Show Cause, despite notification that such a failure to comply could result in an entry of

default. The Court deems the noncompliance willful given that these orders were mailed directly

to O'Brien's address, and yet she repeatedly failed to comply. See, e.g., Kuruwa v. Meyers, No.

09 Civ. 4412 (GWG), 2011 WL 5059187, at *6 n.2 (S.D.N.Y. Oct. 24, 2011) (deeming failure to

comply with order willful where defendant was aware of order, failed to seek extension to

comply, and then did not respond to subsequent order directing him to show cause why he

should not be sanctioned for failure to comply); accord In re Fosamax Prods. Liab. Litig., No. 07

Civ. 3652 (JFK), 2010 WL 1779276, at *2 (S.D.N.Y. Apr. 27, 2010) ("Noncompliance with discovery orders is considered willful when the court's orders have been clear, when the party has understood them, and when the party's noncompliance is not due to factors beyond the party's control.") (quoting Davis v. Artuz, No. 96 Civ. 7699 (GBD), 2001 WL 50887, at *3 (S.D.N.Y. Jan. 19, 2001)).

### 2.  Efficacy of Lesser Sanctions

The Court concludes that a less severe sanction would not secure O'Brien's cooperation. While lesser sanctions should be considered before the Court proceeds to issue a default judgment against a non-compliant party, see Agiwal, 555 F.3d at 302, O'Brien's repeated noncompliance with Court orders and her failure to engage with both counsel for Coach and the Court indicates that any lesser sanction would be "an exercise in futility[.]" Koch v. Rodenstock, No. 06 Civ. 6586 (BSJ) (DF), 2010 WL 2010892, at *7 (S.D.N.Y. Apr. 23, 2010) (Report & Recommendation) (citation omitted), adopted by, 2010 WL 2010900 (S.D.N.Y. May 18, 2010).

### 3.  Duration of Non-Compliance

O'Brien's failure to engage in discovery and comply with Court orders spans several months, and qualifies as an amount of time sufficient to warrant entry of a default judgment. See, e.g., Jackson Hewitt, Inc. v. Excellent Prof'l Servs. LLC, No. 08 Civ. 5237 (JG) (RER), 2010 WL 5665033, at *2 (E.D.N.Y. Nov. 8, 2010) (Report & Recommendation) (two-month period of noncompliance with order to show cause, while "not lengthy[,]" warranted dismissal under Rule 41(b) when "considered in connection with [defendants'] overall failure to participate in this litigation in any meaningful sense"), adopted by, 2011 WL 317969 (E.D.N.Y. Jan. 31, 2011); see also Lyell Theatre Corp. v. Loews Corp., 682 F.2d 37, 42-43 (2d Cir. 1982) (in analogous posture under Rule 41(b), persistent failure to comply with court orders "may warrant

7

dismissal after merely a matter of months") (citation omitted).  Coach served its Discovery

Requests on July 28, 2011 (November 15 Letter at 1) such that the Federal Rules compelled

O'Brien to serve her answers and any objections by August 30, 2011. Fed. R. Civ. P. 6(d),

33(b)(2), 34(b)(2).  She did not.  Nor did she respond to the Court's September 16 Order

directing her compliance by September 28, 2011; the telephone and e-mail messages left for her

by counsel for Coach and the Court seeking to schedule a conference in early October; or the

Court's October 6 Order to Show Cause requiring a response by October 21, 2011.  Accordingly,

O'Brien's history of repeated failure to engage in discovery and comply with this Court's orders

spans several months, warranting an entry of a default judgment. See Kuruwa, 2011 WL

5059187, at *1 (failure to respond to order to show cause warranted finding of default just weeks

after deadline passed).

### 4.  History of Warnings

O'Brien was on notice that a failure to engage in the litigation could result in the entry of

a default judgment.  As early as January, 2011, when Coach filed its Motion for Default

Judgment, O'Brien should have been aware of the possibility that failing to defend against

Coach's lawsuit could result in the entry of a default judgment.  The October 6 Order to Show

Cause further warned O'Brien of this result by specifically directing her to address why the

Court should not find her in default pursuant to Federal Rule of Civil Procedure 37(b)(2)(A)(vi)

as a result of various failures including her failure to respond to Coach's Discovery Requests, to

comply with the September 16 Order, and to return the Court's telephone and e-mail messages.

Despite these warnings, O'Brien has still failed to respond to the October 6 Order to Show

Cause, with the October 21 deadline now weeks past. See Kuruwa, 2011 WL 5059187, at *6 n.2

(entry of default where "the Order to Show Cause by its terms warned Meyers that he could be

8

sanctioned with a default"); Robertson v. Doe, No. 05 Civ. 7046 (LAP), 2008 WL 2519894, at

*7 (S.D.N.Y. June 19, 2008) ("In addition, when the Court gave Mr. Dowbenko a 'final'

opportunity to show cause why sanctions should not be imposed, it explicitly mentioned the

possibility of default judgment. Accordingly, Mr. Dowbenko was on notice of the possibility

that his refusal to fully comply with the Court's discovery order could result in default

judgment.") (internal citation omitted), aff'd, No. 10-2820-cv (2d Cir. Nov. 3, 2011) (Summary

Order). Moreover, given Coach's January, 2011 Motion for Default Judgment, O'Brien has been

on notice for months of Coach's intention to proceed with this matter to default proceedings

should she fail to engage in the litigation. This history of warnings, coupled with the other

factors, weighs in favor of rendering a default judgment at this stage.

### B. Liability

Having determined that O'Brien's noncompliance warrants an entry of default judgment

pursuant to Rule 37, the Court must "follow the procedure for entry of a default judgment as set

forth in [Rule 55]." Kuruwa, 2011 WL 5059187, at *1. "Under the case law interpreting that

rule, the default establishes [O'Brien's] liability as long as the complaint has stated a valid cause

of action[.]" Id. (citations omitted). Although a district court should assess whether "the alleged

facts constitute a valid cause of action[,]" Au Bon Pain v. Artect, Inc., 653 F.2d 61, 65 (2d Cir.

1981), once a default has been established, the Court accepts as true all the factual allegations in

a complaint except as to the amount of damages. See generally City of New York v. Mickalis

Pawn Shop, LLC, 645 F.3d 114, 137 (2d Cir. 2011) ("It is an 'ancient common law axiom' that a

defendant who defaults thereby admits all 'well-pleaded' factual allegations contained in the

complaint.") (citation omitted); see, e.g., Coach, Inc. v. Melendez, No. 10 Civ. 6178 (BSJ)

(HBP), 2011 WL 4542971 (S.D.N.Y. Sept. 2, 2011) (Report & Recommendation), adopted by,

9

2011 WL 4542717 (S.D.N.Y. Sept. 30, 2011). Accordingly, the factual allegations contained in

Coach's Complaint, except as to the amount of damages claimed, must be taken as true.

### 1. Parties and Jurisdiction

Plaintiff Coach, Inc. is a corporation duly organized and existing under the laws of the

State of Maryland, with its corporate headquarters at 516 West 34th Street, New York, New

York 10001. (Compl. ¶ 7). Plaintiff Coach Services, Inc. is a corporation and a wholly owned

subsidiary of Coach, Inc., also existing under the laws of the State of Maryland, with its

corporate headquarters at 1 Coach Way, Jacksonville, Florida 32218. (Compl. ¶ 8). O'Brien is a

resident of the State of Illinois residing at 11616 Kildare Avenue, Alsip, Illinois 60803. (Compl.

¶ 9). She is the registrant, owner, operator, and/or controlling force behind the

www.covermycellphone.com website (the "Website"). (Compl. ¶ 10).[4]

Coach brings this action pursuant to the Lanham Act, 15 U.S.C. § 1051 et seq.

Therefore, the Court has subject matter jurisdiction over Coach's claims pursuant to 28 U.S.C.

§§ 1331, 1338(a), and 15 U.S.C. § 1121(a). The Court also has personal jurisdiction over

O'Brien given that O'Brien shipped a cellular phone cover that she sold on the Website to

counsel for Coach, located in New York (Affirmation of Benjamin Kwapisz in Support of

Plaintiff's Motion to Strike Answer and Motion for a Default Judgment against Defendant, dated

---

[4]     Coach's Complaint asserts claims against several unidentified defendants in addition to
O'Brien, including "Unknown Websites 1-10, 'John Does' 1-10, and Unknown Entities 1-10[.]"
(Compl. ¶ 11). Coach alleges that, "upon information and belief, they are associated with
[O'Brien] and contribute to [O'Brien's] infringing activity [and that] Coach [would] identify
these Unknown Websites, Unknown 'John Does' and Unknown Entities upon further knowledge
and investigation and [would] amend its pleadings accordingly." Given that Coach has not
pursued the action against these unidentified defendants, the Court deems Coach's claims against
them abandoned. See, e.g., MacMillan v. Roddenberry, No. 5:08-cv-351-WTH-GRJ, 2010 WL
668281, at *1 n.1 (M.D. Fla. Feb. 19, 2010) (where plaintiff listed three "John Doe" defendants
in Complaint but did not identify them or assert any arguments in support of claims against them,
court deemed claims abandoned) (citations omitted).

Jan. 11, 2011 ("Kwapisz Aff.") (Dkt. No. 13-5), ¶¶ 1, 4-5), and thus conducted business in New

York. See Gucci Am., Inc. v. MyReplicaHandbag.com, No. 07 Civ. 2438 (JGK), 2008 WL

512789, at *2 (S.D.N.Y. Feb. 26, 2008) (shipment of goods to New York supported finding of

jurisdiction in trademark action) (citing Baron Philippe de Rothschild, S.A. v. Paramount

Distillers, Inc., 923 F. Supp. 433, 436-37 (S.D.N.Y. 1996)).

### 2. The Coach Registered Trademarks

Coach is engaged, both in this District and elsewhere, in the business of manufacturing

and distributing high quality merchandise including handbags, wallets, jewelry, watches, shoes,

eye-glasses, and fragrances under federally registered trademarks associated with the Coach

brand. (Compl. ¶ 12). Coach is known throughout the United States and the world, generating

global sales in the millions of dollars. (Compl. ¶ 14). Coach Services, Inc. is the owner of all of

Coach's United States federal registrations (the "Coach Registered Trademarks"). (Compl. ¶ 15;

see Compl. ¶ 16 (describing the forty-six Coach Registered Trademarks)).

The Coach Registered Trademarks have been used in interstate commerce to identify and

distinguish Coach's merchandise for an extended period of time. (Compl. ¶ 18). The Coach

Registered Trademarks are symbols of Coach's quality, reputation, and goodwill, which Coach

has expended substantial time, money, and other resources to develop, advertise, and promote

such that the marks are "famous" within the meaning of 15 U.S.C. § 1125(c). (Compl. ¶¶ 20-

22). As a result of Coach's efforts, members of the consuming public readily identify

merchandise bearing any of the Coach Registered Trademarks as being high-quality merchandise

sponsored and approved by Coach. (Compl. ¶¶ 23-24). Accordingly, the Coach Registered

Trademarks are valid, subsisting, and in full force and effect, and continue to constitute prima

facie evidence of the validity of the marks. (Compl. ¶ 17).

11

### 3.  O'Brien's Operation of the Website

Subsequent to Coach's adoption, use, and registration of the Coach Registered

Trademarks, O'Brien began selling, offering for sale, distributing, promoting, and advertising on

the Website cellular phone covers bearing counterfeits and infringements of three of the Coach

Registered Trademarks as those marks appear on Coach's products.  (Compl. ¶ 25; Affirmation

of Tiffany Walden In Support of Plaintiffs' Motion to Strike Defendant's Answer and for a

Default Judgment, dated Jan. 12, 2011 ("Walden Aff.") (Dkt. No. 13-4), ¶ 26).  After Coach

discovered the Website in July, 2010, Coach's counsel conducted a "Whois" search to determine

the name and contact information for the Website's registrant.  (Walden Aff. ¶¶ 15-16 & Ex. 1).

The search revealed that the Website was registered by "Covermycellphone, 11616 S. Kildare,

Alsip, Illinois 60803, United States," and that the administrative and technical contacts were both

listed as "OBRIEN, SHARON," at the same Alsip, Illinois address.  (Id. ¶ 16 & Ex. 2).

On July 12, 2010, an employee of Coach's counsel in New York purchased from the

Website a cellular phone cover bearing counterfeits and infringements of the Coach Registered

Trademarks, which he received on or about July 15, 2010.  (Kwapisz Aff. ¶¶ 4-5 & Ex. 2).  The

employee paid $19.99 for the cellular phone cover using PayPal, which then generated an e-mail

indicating that the payment was sent to "sharon obrien[.]"  (Id. at ¶ 4, Ex. 4).  The return address

listed on the package containing the purchase was "Covermycellphone, 11616 S Kildare Ave,

Alsip IL 60803."  (Id. ¶ 5, Ex. 2).  Coach's counsel examined the cellular phone cover and

determined that none of its parts was of genuine Coach origin (Walden Aff. ¶ 21), although the

cover displayed the name "Coach" and contained several counterfeits and infringements of the

Coach Registered Trademarks.  (Id.; see Kwapisz Aff. Ex. 2).

Counsel for Coach contacted O'Brien by letter dated July 19, 2010, which Coach sent

both by e-mail to covermycellphone@comcast.net, and by First-Class Mail to the Alsip, Illinois

address. (Walden Aff. ¶ 23 & Ex. 3). The letter advised O'Brien of her infringing conduct and

demanded that she cease and desist her infringing activities, and supply Coach with certain

information and her supply of infringing goods. (Id.). It also warned her of the consequences of

trademark counterfeiting and infringement. (Id.). By letter dated July 26, 2010, counsel for

Coach again contacted O'Brien, requesting a response to its July 19, 2010 letter. (Id. ¶ 24 & Ex.

4). Having received no response to these letters, Coach brought this action on August 13, 2010.

(Id. ¶ 25).

### 4. O'Brien Is Liable for Trademark Infringement

In its Motion for Default Judgment, Coach requested damages relating to its claims

against O'Brien for willful trademark infringement, but not for the remaining causes of action

asserted in the Complaint. (Plaintiffs' Memorandum of Law in Support of Its [sic] Motion to

Strike Defendant's Answer and for a Default Judgment, dated Jan. 14, 2011 (Dkt. No. 14) ("Pls.'

Mem.") at 17 n.1). Therefore, in evaluating whether Coach has established a valid cause of

action, the Court considers O'Brien's liability as to the claim of trademark infringement only.

See Coach Servs., Inc. v. K Ya Int'l, Inc., No. 09 Civ. 4656 (RMB) (JCF), 2010 WL 2771897, at

*2 (S.D.N.Y. June 10, 2010) (Report & Recommendation) ("In connection with this inquest, the

plaintiff has requested damages only for trademark infringements in violation of the Lanham

Act, and therefore liability need only be considered with respect to that claim."), adopted by,

2010 WL 2771907 (S.D.N.Y. July 12, 2010).

"There are two elements necessary to establish trademark infringement under the Lanham

Act: (1) the plaintiff's ownership of a valid trademark and (2) the likelihood of confusion from

the defendants' use of that trademark without the plaintiff's permission." Id. (citing Chanel, Inc.

v. Louis, No. 06 Civ. 5924 (ARR) (JO), 2009 WL 4639674, at *10 (E.D.N.Y. Dec. 7, 2009)).

The allegations contained in the Complaint satisfy both elements, establishing a valid claim of

trademark infringement.  As to the first element, Coach possesses ownership of the three marks

at issue, all of which are valid, subsisting, and in full force and effect.  (Compl. ¶¶ 16-17).

Notwithstanding Coach's ownership and the validity of these trademarks, O'Brien offered for

sale and sold on the Website cellular phone covers bearing counterfeits and infringements of

these trademarked designs without authorization from Coach.  (Compl. ¶¶ 25, 31; Kwapisz Aff.

¶¶ 4-5, Exs. 1-2).  As to the second element, because of the recognition Coach has achieved as a

well-known luxury brand and due to the nature of its trademarked designs, there is likely to be

confusion between Coach's authentic merchandise and the products O'Brien offered for sale on

the Website that showcased the name "Coach" and other of the Coach Registered Trademarks.

(Compl. ¶¶ 18-24, 32).  Such use of the trademarks constitutes trademark infringement.

Furthermore, I find O'Brien's trademark infringement to be willful.  As an initial matter,

O'Brien's infringement and counterfeiting is deemed willful "[b]y virtue of the default[.]"

Tiffany (NJ) Inc. v. Luban, 282 F. Supp. 2d 123, 124 (S.D.N.Y. 2003); see, e.g., Chloe v.

Zarafshan, No. 06 Civ. 3140 (RJH) (MHD), 2009 WL 2956827, at *7 (S.D.N.Y. Sept. 15, 2009)

("Willfulness may be established by a party's default because an innocent party would

presumably have made an effort to defend itself.").  Moreover, O'Brien's willfulness is apparent

from the similarity between the products she sold and genuine Coach merchandise.  See

Melendez, 2011 WL 4542971, at *5 ("Because the marks used by defendants on their products

are virtually identical to the Coach Registered Trademarks, the conclusion is inescapable that

defendants' infringement and counterfeiting is intentional.") (citing cases).

14

## C. Inquest

### 1. Damages

Having found that O'Brien is liable for trademark infringement, the Court must "conduct an inquiry in order to ascertain the amount of damages with reasonable certainty." Credit Lyonnais Secs. (USA) v. Alcantara, 183 F.3d 151, 155 (2d Cir. 1999); see, e.g., Software Freedom Conservancy, Inc. v. Best Buy Co., No. 09 Civ. 10155 (SAS), 2010 WL 2985320, at *2-3 (S.D.N.Y. July 27, 2010) (granting application for injunctive relief and awarding damages after entering default pursuant to Rule 37). This inquiry "involves two tasks:  determining the proper rule for calculating damages on such a claim, and assessing plaintiff's evidence supporting the damages to be determined under this rule." Credit Lyonnais, 183 F.3d at 155. Relevant to this first task is the fact that Coach has elected to recover statutory damages under 15 U.S.C. § 1117(c), rather than damages tied to its actual losses or to O'Brien's profits. (Walden Aff. ¶ 26 (citing 15 U.S.C. § 1117(c)).  Accordingly, the Court must assess Coach's entitlement to statutory damages under 15 U.S.C. § 1117(c).

As to the second task, while Rule 55(b)(2) provides that the Court, in considering a default judgment, may "conduct hearings or make referrals" to "determine the amount of damages[,]" Fed. R. Civ. P. 55(b)(C), the Second Circuit has held that an inquest into damages may be held on the basis of documentary evidence alone, "as long as [the court has] ensured that there was a basis for the damages specified in [the] default judgment." Fustok v. ContiCommodity Servs., Inc., 873 F.2d 38, 40 (2d Cir. 1989); accord Action S.A., 951 F.2d at 508. Coach's submissions in support of its Motion for Default Judgment include affidavits and attached documentary evidence, which provide a basis for an award of damages and thus obviate the need for a hearing. See, e.g., Kuruwa, 2011 WL 5059187, at *2.

15

Pursuant to the Lanham Act, a trademark owner may elect to recover an award of

statutory damages instead of actual damages for an amount between $1,000 and $200,000 "per

counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court

considers just;" or, if the court finds the use of the mark to have been willful, up to $2,000,000

per counterfeit mark per type of good. 15 U.S.C. § 1117(c); see generally All-Star Marketing

Group, LLC v. Media Brands Co., Ltd., 775 F. Supp. 2d 613, 620-21 (S.D.N.Y. 2011) ("The

rationale for § 1117(c) is the practical inability to determine profits or sales made by

counterfeiters.") (citations omitted).  This provision of the Lanham Act "does not provide

guidelines for courts to use in determining an appropriate award, as it is only limited by what

'the court considers just.'" Gucci Am., Inc. v. Duty Free Apparel, Ltd., 315 F. Supp. 2d 511,

520 (S.D.N.Y. 2004) (internal citation omitted).  Despite this lack of guidelines, "courts have

found some guidance in the caselaw of an analogous provision of the Copyright Act, 17 U.S.C.

§ 504(c), which also provides statutory damages for willful infringement." Id. (citations

omitted).  Under the statutory-damages framework articulated by the Second Circuit in

Fitzgerald Publishing Co., Inc. v. Baylor Publishing Co., 807 F.2d 1110, 1117 (2d Cir. 1986)

("Fitzgerald"), courts consider: (1) "the expenses saved and the profits reaped"; (2) "the

revenues lost by the plaintiff"; (3) "the value of the copyright" or, by analogy, trademark; (4)

"the deterrent effect on others besides the defendant"; (5) "whether the defendant's conduct was

innocent or willful"; (6) "whether a defendant has cooperated in providing particular records

from which to assess the value of the infringing material produced"; and (7) "the potential for

discouraging the defendant." Duty Free Apparel, 315 F. Supp. 2d at 520 (citing Fitzgerald, 807

F.2d at 1117); see, e.g., All-Star Marketing Group, 775 F. Supp. 2d at 622-23 (applying test for

statutory damages in trademark action subsequent to defendants' default); Tiffany (NJ), 282 F.

Supp. 2d at 125 (same); Melendez, 2011 WL 4542971, at *6-7 (same).

Here, the evidence provided by Coach—including affidavits and attached documentary

evidence, which, as noted, the Court may consider in lieu of an inquest proceeding—

demonstrates that Coach is entitled to an award of monetary damages.  Coach has established

that the Coach Registered Trademarks—recognized as symbols of Coach's quality, reputation,

and goodwill—generate Coach millions of dollars in sales per year.  (Compl. ¶¶ 14-24).

Although nothing in the record demonstrates whether Coach lost any revenue from O'Brien's

infringement, the goal of deterring similar conduct generally requires a significant award.  See,

e.g., Louis Vuitton Malletier, S.A. v. LY USA, No. 06 Civ. 13463 (AKH), 2008 WL 5637161, at

*2 (S.D.N.Y. Oct. 3, 2008).  In addition, this Court has already found that O'Brien's conduct was

willful "[b]y virtue of [her] default," Tiffany (NJ), 282 F. Supp. 2d at 124, and because of the

similarity between genuine Coach merchandise and the cellular phone covers O'Brien offered for

sale and sold on the Website.  Although the record does not show any evidence of O'Brien's

continued sale of cellular phone covers bearing counterfeit Coach Registered Trademarks,[5] the

Complaint alleges and the Court accepts as true that, "[d]espite being put on notice by Coach of

[O'Brien's] illegal activities, [she] continued to offer for sale and sell merchandise bearing

counterfeits of the Coach Registered Trademarks." (Compl. ¶ 27).  Thus, the third, fourth, fifth,

and seventh factors weigh in favor of an award of statutory damages, with the second factor

remaining neutral.

_____

[5]      Indeed, the Court notes that the Website (last visited November 28, 2011) appears to be
no longer active.  See Muller-Paisner v. TIAA, 289 F. App'x. 461, 466 n.5 (2d Cir. 2008) (taking
judicial notice of publication of website) (citation omitted) (Summary Order).

Notwithstanding this analysis, Coach's demand for millions of dollars in statutory

damages is excessive.  Coach seeks damages only for the three marks used by O'Brien in her

"advertising, distributing, offering for sale and selling of counterfeit Coach products[.]"

(Walden Aff. ¶ 26 (citing Compl. Ex. 1; Kwapisz Aff. ¶ 5 & Ex. 2)).  In particular, without

explanation for its calculation, Coach seeks $3,000,000, or $1,000,000 per trademark infringed

(Walden Aff. ¶ 27), an amount that the record does not support given the apparently modest scale

of O'Brien's activities.  In O'Brien's Opposition to the Motion for Default Judgment, she states

that "[t]he total revenues (not profits) resulting from [her] sales of the alleged infringing items

was a mere $5,533.76.  The profit – *if any* – would be a fraction thereof."  (Def.'s Mem. at 3

(emphasis in original)).  O'Brien apparently calculated that figure using documents that were

contained within a voluntary production to Coach that she made during settlement negotiations

last year of all "relevant sales records" for the Website, which she characterized as "documents

showing literally every transaction and every dollar and penny received from the sale of the

allegedly-infringing goods from the inception of [the Website] to the present."  (Def.'s Mem. at

3).  Coach concedes receipt of these materials but characterizes the production as "select sales

records, which [O'Brien] purported fully documented her sales of infringing and counterfeit

Coach products."  (Reply Affirmation of Walter-Michael Lee in Further Support of Plaintiffs'

Motion to Strike Defendant's Answer and for a Default Judgment and in Opposition to

Defendant's Reply, dated Feb. 4, 2011 ("Reply" or "Pl.'s Reply Mem.") (Dkt. No. 19), ¶ 7

(citation omitted)).  Despite the implication that this disclosure was incomplete and thus did not

reflect the entirety of O'Brien's sales, Coach provides no evidence to suggest that O'Brien

withheld any information reflecting additional sales, or that the revenues were higher than she

proffered.  Accordingly, the first and sixth factors weigh in favor of a damages award

18

commensurate with the scale of the Website's sales. See Duty Free Apparel, 315 F. Supp. 2d at

520 ("[S]tatutory damages 'should be woven out of the same bolt of cloth as actual damages[.]'")

(citation omitted); see also Melendez, 2011 WL 4542971, at *7 ("I believe it is desirable that an

award of statutory [damages] be tied to some rough estimate of the actual damages that would be

recoverable[.]").

Courts frequently issue awards far below the statutory maximum on a per mark basis

even where, as here, "the defendant willfully infringes on the plaintiff's mark and fails to stop

such behavior after being put on notice by the plaintiff or the court, [although] there is no

concrete information about the defendant's actual sales figures and profits and the estimate of

plaintiff's lost revenue." All-Star Marketing Group, 775 F. Supp. 2d at 624 (citing cases); see,

e.g., K Ya Int'l, Inc., 2010 WL 2771897, at *3 (deeming damages award of $20,000—$6,667 per

infringement—sought by Coach "appropriate [trademark infringement] award, as it effectively

serves both the punitive and deterrent purposes of 15 U.S.C. 1117(c)"); Cartier Int'l B.V. v. Ben-

Menachem, No. 06 Civ. 3917, 2008 WL 64005, at *15 (S.D.N.Y. Jan. 3, 2008) ($50,000

statutory damages for each of nineteen counterfeited marks deemed "sufficient to meet the goals

of [15 U.S.C. § 1117(c)], including compensating the Plaintiffs and deterring future violations");

Kenneth Jay Lane, Inc. v. Heavenly Apparel, Inc., No. 03 Civ. 2132 (GBD) (KNF), 2006 WL

728407, at *6 (S.D.N.Y. Mar. 21, 2006) (where plaintiff did not provide court with any

information about corporate defendant's business, "market in which [defendant] sold or is

continuing to sell counterfeit products, or any estimate of the volume of products bearing the

plaintiff's marks sold by the defendant[,]" court awarded $125,000 per infringed mark because

that amount would sufficiently "impress upon [defendant] that there are consequences for its

misconduct" and would "serve as a specific deterrent to [defendant] and as a general deterrent to

19

others who might contemplate engaging in infringing behavior in the future"). This logic, and the application of the Fitzgerald framework, suggest that Coach's requested damage award is inappropriate.

Coach does not argue that the Website sold any infringing products—or even any non-infringing products—other than cellular phone covers. Representative samples of printouts from the Website indicate that these covers cost anywhere from $15.99 to $24.99. (Walden Aff. ¶ 15 Ex. 1). The cover purchased by counsel for Coach cost $19.99. (Kwapisz Aff. ¶ 4 & Ex. 1). These figures indicate that O'Brien would need to sell more than 50,025 cellular phone covers per year—or more than 4,169 per month, or 139 per day—to earn revenue equal to $1,000,000 a year. She would need to sell three times that amount to equal $3,000,000 in revenue per year, meaning 150,075 per year, 12,507 per month, or 417 per day. Such sales are unsupported by the allegations in the Complaint and seem rather far-fetched in light of the record. As Magistrate Judge Pitman observed in Melendez, another trademark case brought by Coach, "[a]lthough I have no empirical evidence concerning the issue, the notion that defendants—operators of a relatively obscure internet sales site—are selling more than 400 [hand]bags per week seems unlikely." 2011 WL 4542971, at *7 (noting that "the typical starting point for assessing statutory damages is the actual damages calculation, namely plaintiff's losses and/or defendant's profits").

In her Opposition to the Motion for Default Judgment, O'Brien represented that the Website generated only $5,533.76 in revenue (Def's Mem. at 3), and, while the "back up" for that assertion was not presented to the Court, Coach has not offered any evidence to contradict that claim. Accepting the $5,533.76 figure as the entirety of O'Brien's revenue for the sake of this inquiry, without knowledge as to how much O'Brien marked up the cellular phone covers—for which there is no basis in the record—or what a typical mark-up is for a cellular phone cover,

20

any findings as to her profits would "simply be a guess[.]" M.B.S. Love Unlimited, Inc. v.

Park's Sportswear Corp., No. 90 Civ. 0311 (LBS), 1990 WL 276561, at *3 (S.D.N.Y. Mar. 28,

1990) (without evidence indicating "what mark-up is normal in this form of retailing [the T-shirt

industry] . . . [w]ere this Court to adopt some recognized form of retail pricing (e.g., keystone

pricing, i.e., three times wholesale cost), it would simply be a guess as to the applicability of

such pricing to T-shirt wholesalers."). Notwithstanding the apparent dearth of case law or

documentary evidence to establish what mark-up is typical for cellular phone covers, in order to

award damages that are "just," 15 U.S.C. § 1117(c)(2), I recommend the Court apply the three-

hundred percent mark-up that courts have used in other trademark infringement cases involving

luxury goods. See, e.g., Melendez, 2011 WL 4542971, at *7 (trademark action involving Coach

handbags); Malletier v. Apex Creative Int'l Corp., 687 F. Supp. 2d 347, 358 (S.D.N.Y. 2010)

(trademark action involving Louis Vuitton handbags). Using this rubric, if O'Brien's revenue

from the Website equaled $5,533.76, then O'Brien made approximately $4,150 in profits. Given

that Coach seeks damages for infringement of three of the Coach Registered Trademarks, Coach

would thus be entitled to recover $12,450 in statutory damages. Considering the willful nature

of O'Brien's infringement, this amount is "an appropriate award as it effectively serves both the

punitive and deterrent purposes of 15 U.S.C. 1117(c)." K Ya Int'l, Inc., 2010 WL 2771897, at

*3 (awarding $6,667 per infringed mark against corporate defendant that sold counterfeit

handbags, and maintained offices and retail stores in Manhattan and Brooklyn).[6]

---

[6]    Where trademark infringement is deemed willful, the Lanham Act provides for either
treble damages under 15 U.S.C. § 1117(b) (where a plaintiff seeks actual damages under 15
U.S.C. § 1117(a)) or an award of up to $2,000,000 per infringed trademark under 15 U.S.C.
§ 1117(c)(2) (where a plaintiff seeks statutory damages under 15 U.S.C. § 1117(c)).  Because
Coach seeks statutory damages under 15 U.S.C. § 1117(c), it does not seek and the Court does
not award treble damages as it would if Coach sought actual damages under 15 U.S.C. § 1117(a).
Nor does Coach request the enhanced $2,000,000 award permitted by 15 U.S.C. § 1117(c)(2).

### 2. Costs and Fees

Coach also requests an award of costs in the amount of $456.95, comprised of the

$350.00 filing fee, a $50 investigative fee, and the cost of the "Evidential Purchase Fees," which

Coach purports to be $56.95.  (Affirmation of Walter-Michael Lee in Support of Plaintiffs'

Motion to Strike Defendant's Answer and for a Default Judgment, dated Jan. 14, 2011 ("Lee

Aff.") (Dkt. No. 13-3), ¶ 20).  However, because the record indicates the cellular phone cover

that counsel for Coach purchased cost only $25.94, inclusive of shipping fees (Kwapisz Aff. ¶ 4

& Ex. 1), rather than $56.95, Coach is entitled to reimbursement for fees in the amount of

$425.94.  Although Coach may be entitled to reasonable attorney's fees under 15 U.S.C.

§ 1117(a), see Tiffany (NJ), 282 F. Supp. 2d at 125, Coach has indicated that it "does not seek

recovery of its attorneys' fees."  (Lee Aff. ¶ 21; Pls.' Mem. at 25 n.3).

### 3. Injunctive Relief

In addition to statutory damages, Coach also seeks a permanent injunction.  (Pl.'s Mem.

at 26).  In the Second Circuit, where a party seeks injunctive relief in an action alleging

trademark infringement, courts apply the four-factor test enunciated by the Supreme Court in

eBay Inc. v. MercExchange, LLC, 547 U.S. 388, 390 (2006).[7]  Under that standard, injunctive

---

(Pls.' Mem. at 17-24).  Although Coach has established that O'Brien's trademark infringement
was willful, under these circumstances—specifically given the scale of O'Brien's operations and
the product she sold, cellular phone covers—the award of $12,450 "will be sufficient to meet the
goals of the statute, including compensating the Plaintiffs and deterring future violations."
Cartier, 2008 WL 64005, at *15.

[7]      In Salinger v. Colting, 607 F.3d 68, 78 n.7 (2d Cir. 2010), the Second Circuit extended
the test articulated by eBay, a patent action involving a permanent injunction, "to preliminary
injunctions in the context of copyright cases[.]"  Although the Second Circuit did not explicitly
extend the eBay test to trademark actions, the Court stated that it saw "no reason that eBay
would not apply with equal force to an injunction in any type of case."  Id. (emphasis in original)
("eBay strongly indicates that the traditional principles of equity it employed are the presumptive
standard for injunctions in any context.").  In light of Salinger, district courts in this Circuit have

relief should issue where the plaintiff has established a likelihood of success on the merits in

seeking a preliminary injunction, or has actually succeeded on the merits in seeking a permanent

injunction, and that: (1) plaintiff is likely to suffer irreparable injury in the absence of an

injunction; (2) remedies at law, such as monetary damages, are inadequate to compensate

plaintiff for that injury; (3) the balance of hardships tips in plaintiff's favor; and (4) the public

interest would not be disserved by the issuance of a preliminary injunction. See Salinger, 607

F.3d at 80 (citing eBay, 547 U.S. at 391).

The first eBay factor, irreparable harm, is "automatically satisfied by actual success on

the merits, as irreparable harm is established by 'a showing of likelihood of confusion.'"

Genesee Brewing Co. v. Stroh Brewing Co., 124 F.3d 137, 142 (2d Cir. 1997) ("[T]he

requirement of irreparable harm carries no independent weight, as we have held that a showing

of likelihood of confusion (a requirement of both trademark infringement and unfair competition

claims) establishes irreparable harm."). O'Brien's default constitutes an admission of liability as

to the trademark infringement claim, as noted above, such that Coach has established a

likelihood of confusion from which irreparable harm is presumed.

The second eBay factor, no adequate remedy at law, "is satisfied where the record

contains no assurance against defendant's continued violation" of trademarks. Montblanc-

Simplo GmbH v. Colibri Corp., 692 F. Supp. 2d 245, 259 (E.D.N.Y. 2010) (applying eBay test

to trade dress claims after entry of default). Where default is entered, "[a] court may infer from a

defendant's default that it is willing to, or may continue its infringement." Pearson Educ., Inc. v.

---

extended eBay to trademark actions as well. See, e.g., U.S. Polo Ass'n, Inc. v. PRL USA
Holdings, Inc., --- F. Supp. 2d ---, 2011 WL 1842980, at *19-20 (S.D.N.Y. May 13, 2011)
(applying Salinger's extension of eBay in a trademark action) (citing Pretty Girl, Inc. v. Pretty
Girl Fashions, Inc., 778 F. Supp. 2d 261, 265 (E.D.N.Y. 2011) (same); NYC Triathlon, LLC v.
NYC Triathlon Club, Inc., 704 F. Supp. 2d 305, 328 (S.D.N.Y. 2010) (same)).

Vergara, No. 09 Civ. 6832 (JGK) (KNF), 2010 WL 3744033, at *4 (S.D.N.Y. Sept. 27, 2010)

(citations omitted), adopted by, Order at Dkt. No. 21 (S.D.N.Y. May 11, 2011). O'Brien's

default thus weighs against her on this factor.

Finally, the third and fourth eBay factors, those requiring a balance of hardships and a

consideration of the public interest, favor Coach. "The balance of hardships weighs in [Coach's]

favor since [O'Brien] has not identified any hardships for the Court to consider." Hounddog

Prods., LLC v. Empire Film Grp., Inc., No. 09 Civ. 9698 (VM) (JLC), 2011 WL 4336694, at *9

(S.D.N.Y. Sept. 16, 2011) (Report & Recommendation), adopted by, 2011 WL 5519829

(S.D.N.Y. Nov. 10, 2011); see also Pearson Educ., Inc., 2010 WL 3744033, at *5 (same).

Likewise, "the public has an interest in not being deceived—in being assured that the mark it

associates with a product is not attached to goods of unknown origin and quality." NYC

Triathlon, LLC, 704 F. Supp. 2d at 344 (granting motion to enjoin defendant from any further

violations of trademark). Here, the public has an interest in being able to rely on the high quality

of the products bearing the Coach Registered Trademarks so that the fourth factor, like the

others, favors injunctive relief.

Accordingly, I recommend that the Court enter the permanent injunction Coach seeks,

and enjoin O'Brien and her employees, agents, servants, successors, and assigns, and all those

acting in concert or participating therewith, from:

> (a)    using any reproduction, counterfeit, copy, or colorable imitation of the
> Coach Registered Trademarks to identify any goods or the rendering of any
> services not authorized by Coach;
>
> (b)    engaging in any course of conduct likely to cause confusion, deception or
> mistake, or injure Coach's business reputation or weaken the distinctive quality of
> the Coach Registered Trademarks, Coach's name, reputation or goodwill;
>
> (c)    using a false description or representation including words or other
> symbols tending to falsely describe or represent O'Brien's unauthorized goods as

24

being those of Coach or sponsored by or associated with Coach and from offering such goods in commerce;

(d)     further infringing or diluting the Coach Registered Trademarks by manufacturing, producing, distributing, circulating, selling, marketing, offering for sale, advertising, promoting, displaying or otherwise disposing of any products not authorized by Coach bearing any simulation, reproduction, counterfeit, copy or colorable imitation of the Coach Registered Trademarks;

(e)     using any simulation, reproduction, counterfeit, copy or colorable imitation of the Coach Registered Trademarks in connection with the promotion, advertisement, display, sale, offering for sale, manufacture, production, circulation or distribution of any unauthorized products in such fashion as to relate or connect, or tend to relate or connect, such products in any way to Coach, or to any goods sold, manufactured, sponsored or approved by, or connected with Coach;

(f)     making any statement or representation whatsoever, or using any false designation of origin or false description, or performing any act, which can or is likely to lead the trade or public, or individual members thereof, to believe that any services provided, products manufactured, distributed, sold or offered for sale, or rented by O'Brien are in any way associated or connected with Coach, or is provided, sold, manufactured, licensed, sponsored, approved or authorized by Coach;

(g)     engaging in any conduct constituting an infringement of any of the Coach Registered Trademarks, of Coach's rights in, or to use or to exploit, said trademark, or constituting any weakening of Coach's name, reputation and goodwill;

(h)     using or continuing to use the Coach Registered Trademarks or trade names in any variation thereof on the Internet (either in the text of a website, as a domain name, or as a keyword, search word, metatag, or any part of the description of the site in any submission for registration of any Internet site with a search engine or index) in connection with any goods or services not directly authorized by Coach;

(i)     hosting or acting as Internet Service Provider for, or operating or engaging in the business of selling any web site or other enterprise that offers for sale any products bearing the Coach Registered Trademarks;

(j)     acquiring, registering, maintaining or controlling any domain names that include the COACH trademark or any of the other Coach Registered Trademarks or any marks confusingly similar thereto, activating any website under said domain names, or selling, transferring, conveying, or assigning any such domain

25

names to any entity other than Coach;

(k)   using any e-mail addresses to offer for sale any nongenuine products bearing counterfeits of the Coach Registered Trademarks;

(l)   having any connection whatsoever with any websites that offer for sale any merchandise bearing counterfeits of the Coach Registered Trademarks;

(m)   secreting, destroying, altering, removing, or otherwise dealing with the unauthorized products or any books or records which contain any information relating to the importing, manufacturing, producing, distributing, circulating, selling, marketing, offering for sale, advertising, promoting, or displaying of all unauthorized products which infringe the Coach Registered Trademarks; and

(n)   effecting assignments or transfers, forming new entities or associations or utilizing any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth in subparagraphs (a) through (m).

## III.   CONCLUSION

For all of the foregoing reasons, I recommend that the Court enter a default judgment against O'Brien as to liability pursuant to Rule 37(b)(2)(A)(vi) and Rule 55(a). I further recommend that, pursuant to Rule 55(b), the Court award Coach statutory damages of $12,450.00 and fees in the amount of $425.94, for a total of $12,875.94, and that a permanent injunction be entered as described above.

## PROCEDURES FOR FILING OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6. Such objections, and any responses to such objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable J. Paul Oetken and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Judge Oetken. **FAILURE TO FILE OBJECTIONS WITHIN**

**FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.**  See Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010) (citing Cephas v. Nash, 328 F.3d 98, 107 (2d Cir. 2003) and Mario v. P & C Food Mkts., Inc., 313 F.3d 758, 766 (2d Cir. 2002)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.  If O'Brien does not have access to cases cited herein that are reported on LexisNexis or Westlaw, she should request copies from Coach.  See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009).

Dated: New York, New York
November 28, 2011

JAMES L. COTT
United States Magistrate Judge

**Copies of this Report & Recommendation have been sent by ECF to counsel and by mail to**

Sharon O'Brien
11616 S. Kildare Street
Alsip, IL 60803

27